**James JOHNSON and Benjamin White, Plaintiffs,**

v.

**BUNNY BREAD COMPANY, Defendants.**

**No. S78–0108C.**

United States District Court,
E. D. Missouri,
Southeastern Division.

Feb. 22, 1980.

---

Lisa S. VanAmburg, Anderson, Everett, Sedey & VanAmburg, St. Louis, Mo., for plaintiffs.

A. M. Spradling, III, Spradling & Spradling, Cape Girardeau, Mo., for defendants.

## MEMORANDUM

WANGELIN, Chief Judge.

This matter is before the Court for a decision on the merits following a two-day bench trial held May 10 and 11, 1979. Plaintiffs, both black males and former employees of defendant, seek recovery of back pay, plus reinstatement, attorneys' fees and costs and certain declaratory and injunctive relief for defendant's alleged violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiffs also seek recovery of punitive damages from defendant for willful and malicious discrimination on the basis of race pursuant to 42 U.S.C. § 1981.

Plaintiffs were employed within three days of each other by defendant in the latter part of June, 1975, as helper/cleaners on the bottom of defendant's seniority list. Plaintiffs allege discrimination by reason of (a) their racially motivated discharge, (b) the terms and conditions of their employment, (c) defendant's practice of maintaining racially segregated job categories, and (d) defendant's retaliation for plaintiffs' filing of charges with the Equal Employment Opportunity Commission (EEOC).

After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court hereby makes and enters the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is hereby adopted as such and, conversely, any conclusion of law applicable as a finding of fact is adopted as such.

### Findings of Fact

1. Defendant Bunny Bread, Inc. is a corporation doing business in the State of Missouri and is engaged in the manufacture and production of sweet rolls, doughnuts, and fruit breads at its facility in Cape Girardeau, Missouri. Defendant employs at least fifteen persons at this facility and is an employer subject to the Act, 42 U.S.C. § 2000e(b).

2. Plaintiffs James Johnson and Benjamin White are black male citizens of the United States, residing in Cape Girardeau, Missouri. Plaintiffs were employed by the defendant on June 25, 1975 and June 28, 1975, respectively. At the time of the trial neither plaintiff was employed by defendant.

3. At all times relevant to this suit there was in existence a collective bargaining agreement between defendant and Local 199 of the Bakers and Confectionery Workers International Union of America governing the relative rights and privileges of the parties with respect to the operation and working conditions at defendant's Cape Girardeau facility. Under Article 21 of the collective bargaining agreement, there were several job classifications of which "helper" and "cleaners" were denominated "miscellaneous classifications" and which were the lowest paying of any of the classifications. Both plaintiffs were hired as helper/cleaners upon referral by the Missouri Employment Security Division, resulting from defendant's production manager, Rusty Schaffer's, request of Mr. Frank Rayburn at the employment office for applications from black people.

4. Although the testimony is conflicting, and the situation is exacerbated by the destruction of certain of defendant's records during a flood in 1976, it appears that no blacks were working in defendant's plant at the time plaintiffs were hired. There are presently no pre-1976 records indicating the historical racial composition of defendant's work force. However, it is clear that both prior, during and subsequent to plaintiffs' tenure as employees at defendant's facility, other blacks were employed by defendant. From 1975 to 1978 defendant employed seventy two (72) to seventy four (74) employees. Though a somewhat generalized statistical showing can be proper in a "disparate impact" case, the statistics introduced herein are speculative and are not probative of disparate impact in defendant's alleged policies of hiring by word-of-mouth, lack of formal merit evaluations, or performance evaluation policies in that plaintiff has not attempted to correlate the ten year old statistics to the work force in the relevant geographical area. Furthermore, the hiring of both plaintiffs was accomplished through just the type of word-of-mouth referral to which plaintiffs object. Additionally, plaintiffs have not shown that defendant's lack of formal merit evaluations or performance evaluation policies had a disparate impact or operated to exclude blacks.

5. Defendant did not discriminate against either plaintiff in classifying them in the employment category of cleaner/helper. Prior to the hiring of either plaintiff, whites had been hired at the entry level of cleaner/helper and have subsequently been hired at that level. The cleaner/helper job is simply the lowest entry level and lowest seniority job and there is no evidence that defendant's actions in placing plaintiffs in this category was based upon any discriminatory criterion illegal under the Act. Neither plaintiff has attempted to show that they were qualified for any job requiring greater skills.

6. The terms and conditions of employment of all employees at defendant's facility, with the exception of Mr. Schaffer, were governed by the provisions of the collective bargaining agreement introduced in evidence. This agreement provided for a "closed shop" in that all new employees were required to join the union subsequent to completing a thirty-day probationary period. It was not the defendant-employer's responsibility to get individual employees signed up with the union. Plaintiffs did sign up with the union on August 27, 1975. In this regard, the Court notes that defendant did not attempt to influence the union to extend the probationary period of either plaintiff such that they would not be protected by the grievance and arbitration provisions of the collective bargaining agreement in the event of their discharge. Neither plaintiff was at any time denied his right to the minimum guarantees under the collective bargaining agreement providing for seven hours pay per day or forty hours work per week.

7. Because the cleaner/helper category was at the bottom of the seniority list, included among the job duties were those which could be considered the least desirable. A cleaner/helper on any given day could be expected to sweep floors, wash buckets, wash walls with bleach cleanser and provide breaks for workers on the production line. Additionally, at varying intervals usually once a week or twice a month, the milkstone residue in the brew tank would require hand scraping and cleaning, as would the coolers. These job duties did not change because of plaintiff's race. Prior to the hiring of either plaintiff, white employees had done the exact same jobs required of the plaintiffs. Both plaintiffs complained of being shifted excessively from job to job, although it is apparent to this Court that filling in for workers taking breaks on the production line was desirable in that it was the only form of on-the-job training which would prepare a worker for eventual accumulation of seniority and a concomitant shift out of the cleaner/helper category. Plaintiffs complained mightily about the use of a high-pressure sprayer by white employees when cleaning the brew tank, their contention being that the method of hand scraping the brew tank was resurrected especially for them since they

were black. The Court finds this contention total fabrication and wholly unsupported by the evidence. For a short period of time defendant attempted to clean the brew tank exclusively with a high-pressure sprayer but after only a few months learned that such a cleaning method was unacceptable in that it would not totally remove the milkstone residue which would build up on the brew tanks. Accordingly, after a brief hiatus, the handwashing method was reinstituted.

8. Although plaintiff Johnson's performance was qualitatively inferior to that of plaintiff White, the performance of both plaintiffs on the job was satisfactory until they joined the union. On September 16, 1975, plaintiff Johnson was discharged when he laughed and made faces at plant manager Rusty Schaffer. Plaintiff Johnson had been racking rolls in a wholly unacceptable manner when Schaffer was notified by a shipping clerk that the rolls were being mashed. Schaffer confronted Johnson and the above incident ensued. Defendant did not have a warning policy with respect to discharge for insubordination and Schaffer discharged Johnson on the spot. Johnson filed a grievance with Local Union 199 and complaints with the National Labor Relations Board and the Equal Employment Opportunity Commission. As a result of a meeting between management personnel and Local 199 officials plaintiff Johnson was reinstated on October 1, 1975 with one week's loss of pay. On September 3, 1975, plaintiff White was discharged by defendant's foreman Perry Amelunke (a member of Local 199) for failure to keep up with production on the line. Amelunke told White "if you can't do this job, why don't you leave?" Amelunke did not tell White he was fired, White merely went home and when he tried to come back to work the next day defendant informed him that he had quit by walking off his job. Plaintiff White filed a grievance with Local 199 and a complaint with the EEOC. As a result of a meeting between management personnel and Local 199 officials, plaintiff White was reinstated on September 17, 1975. The Court finds that neither discharge was dis-

criminatorily motivated. White employees had been discharged by defendant for similar rule violations and defendant's treatment of plaintiffs was justified under the circumstances.

9. During plaintiff's term of employment with defendant the Court finds there was no management harassment of plaintiffs. It is apparent that there was a small amount of harassment on the part of plaintiffs' fellow workers but it is not apparent that Rusty Schaffer was aware of this conduct. In the opinion of this Court it is likely that Don Clubb used the term "nigger" in plaintiffs' presence. However, inasmuch as Clubb was a member of the union, although he was a foreman, absent proof of acquiescence by management, his conduct cannot be attributed to defendant. Rusty Schaffer was not aware of Clubb's use of the term. Besides discrimination in job duties, which allegation has been dealt with in finding 7, supra, plaintiffs claim that management discriminated against them by supervising them excessively. However, it is apparent to this Court that all employees in the plant were supervised very closely and it further appears that Schaffer was hard on everyone. Plaintiff White's testimony that Schaffer used the term "nigger" is totally contrary to his deposition testimony, and the Court finds no such incident occurred.

10. Plaintiff Johnson's work habits worsened dramatically after he joined the union. Plaintiff Johnson failed to promptly respond to orders given him by his supervisors and would only do the work after repeated orders, and a reminder of the consequences if he did not comply. Qualitatively, his performance could only be described as poor. Plaintiff White, on the other hand, continued to be a satisfactory worker subsequent to joining the union.

11. On January 15, 1976, defendant terminated the employment of plaintiff Johnson. The termination occurred as a result of plaintiff Johnson's insubordination. In essence, Johnson sang a song in the presence of supervisor Buck and manager Schaffer which indicated that Johnson

thought supervisor Buck was a "stupid son-of-a-bitch". Regardless of the other aspects of this incident which included Johnson wanting to stay late after all the employees had finished up early and gone home, and Johnson's failure to put all his gear back in its proper place, the Court finds that Johnson's "song" was insubordination warranting termination of his employment.

12. Plaintiff White voluntarily terminated his employment with defendant on or about January 21, 1976. Plaintiff White's amended complaint alleges he was discharged by defendant on December 5, 1975. However, there is no evidence of the discharge, nor has plaintiff proven that he was constructively discharged. At trial, plaintiff White indicated he quit work. Though he testified he only received one raise, it is apparent that plaintiff White received three raises and in this regard the Court notes that plaintiff White remembered all the raises he had received with his present employer. The credible evidence in this case indicates that very little hazing took place at defendant's plant. Defendant did not make plaintiff White's working conditions intolerable or harass him to the point he was forced to quit, and plaintiff has failed to show specific intent on the part of defendant to induce plaintiff White to quit. Plaintiff White's subsequent work history reveals a pattern of voluntarily terminating his employment.

13. As a corollary to findings 8, 9, 11 and 12 above, defendant did not discharge either plaintiff in retaliation for filing complaints with the EEOC, the NLRB or the Union. Stated in another manner, retaliation was not a substantial or motivating factor in plaintiff Johnson's discharge, and plaintiff White was not discharged.

### Conclusions of Law

■ This Court has jurisdiction over the parties herein and has subject matter jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3). With respect to either discharge, plaintiff Johnson has not made out a prima facie showing of disparate treatment by showing proof of discriminatory motive.

*Teamsters v. United States*, 431 U.S. 324, 335–336 n. 15, 97 S.Ct. 1843, 1854–1855, 52 L.Ed.2d 396 (1977). Plaintiff Johnson did not show that other white employees who were guilty of the same degree of face-to-face insubordination to their supervisors were nonetheless retained. Even if such a prima facie showing was made, defendant has shown that it based its termination of plaintiff on a legitimate consideration and not on plaintiff Johnson's race. Plaintiff Johnson has not shown that the proffered justification was pretextual. Plaintiff Johnson was fired for one reason, i. e., insubordination.

■ Plaintiff White voluntarily terminated his employment with defendant and his termination was not a constructive discharge. Defendant did not treat either plaintiff differently than white employees with respect to supervision, remuneration, work conditions, warnings and reprimands or any other element of their employment.

Since defendant's actions were not based upon discriminatory criterion illegal under the Act, *a fortiori*, plaintiffs have not shown intentional, deliberate and/or malicious violations of 42 U.S.C. § 1981.

Judgment will be entered for the defendant, with costs taxed against the plaintiff and defendant's motion for attorneys' fees will be denied.