James JOHNSON and Benjamin White, Appellants,

v.

BUNNY BREAD COMPANY, Appellee.

No. 80–1215.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 16, 1981.

Decided April 16, 1981.

Lisa S. Van Amburg, oa/rebuttal, St. Louis, Mo., for appellants.

A. M. Spradling, III, oa, Cape Girardeau, Mo., for appellee.

Before ROSS and HENLEY, Circuit Judges, and RENNER, District Judge.*

HENLEY, Circuit Judge.

Appellants, James Johnson and Benjamin White, both black men, individually brought suit against appellee, Bunny Bread Company (Bunny Bread), alleging that Bunny Bread had engaged in discriminatory and unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 §§ 703–704, 42 U.S.C. § 2000e–2 to 3.[1] Following a bench trial, the district court[2] found that each appellant failed to establish a prima facie case. Alternatively, assuming such a case was made by Johnson, the district court found the case was rebutted by a showing of non-pretextual justification. Accordingly, judgment was entered against each appellant. On appeal we affirm.

*Background.*

Appellants were hired by Bunny Bread in June, 1975. A referral by the Missouri Employment Security Office, made in response to Bunny Bread's request for applications of qualified black people, evidently led to their hiring. Each was hired as a cleaner/helper (helper), an entry level position requiring no particular skill but only that an individual be able-bodied, between the ages of 18 and 65, and capable of following instruction, safety rules, and work regulations. A helper's duties primarily consisted of cleaning walls, cleaning buckets, cleaning and sanitizing the brew tank, and substituting for any production line employee taking a break.

The labor agreement in force at Bunny Bread required that new employees serve a thirty day probationary employment period. Bunny Bread was a closed shop, and when this probationary period ended an employee had to join the Union if he wished to continue working. During their respective probationary periods, appellants spent most of their time performing cleaning duties and engaged in little production line work. Their performance during this period was satisfactory. At the expiration of their probationary periods, both appellants joined the Union.

After joining the Union Johnson's performance declined. On September 16, 1975 Johnson was discharged from his employment. This discharge was spawned by an incident involving Johnson and the plant supervisor, Rusty Schaffer. Immediately after his discharge Johnson filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that Bunny Bread, in discharging him, had violated Title VII.

On September 16, 1975, not long after joining the Union, White was discharged. This discharge arose from an incident involving White and Perry Amelunke, an assistant supervisor. Immediately after this discharge, White filed a complaint with the EEOC, alleging that Bunny Bread, in discharging him, had violated Title VII. To rectify any injustice which might have resulted from appellants' discharges, a meeting was held with Bunny Bread management, Union representatives, Johnson and White in attendance, and Johnson and White were reinstated.

After their reinstatements, appellants continued to perform the tasks regularly performed by helpers and they spent more time on the production line than they had previously. After reinstatement but prior to January 15, 1976, Johnson filed a second complaint with the EEOC. In this complaint he alleged that Bunny Bread, in violation of Title VII, had imposed discriminatory working conditions on him and had

* The Honorable Robert G. Renner, United States District Judge for the District of Minnesota, sitting by designation.

1. Appellants' complaint before the district court also alleged a violation of 42 U.S.C. § 1981, and requested punitive damages. Although on appeal appellants have focused on the alleged Title VII violation, we nonetheless find, as our discussion below indicates, that there was no racial discrimination constituting a violation of section 1981.

2. United States District Court for the Eastern District of Missouri, The Honorable H. Kenneth Wangelin presiding. The opinion of the district court is reported at 486 F.Supp. 91 (E.D. Mo.1980).

harassed him in retaliation for his having filed a complaint with the EEOC. On January 15, 1976, Johnson was again discharged from his employment. This discharge arose from an incident involving Johnson and an assistant supervisor, John Buck.

On January 5, 1976, White filed a second complaint with the EEOC, alleging that Bunny Bread, in violation of Title VII, had imposed discriminatory working conditions on him and had harassed him in retaliation for his having filed a complaint with the EEOC. White resigned from Bunny Bread on January 21, 1976.

On October 11, 1978, appellants filed the present suit in district court. In main they alleged before the district court and allege here that Bunny Bread violated section 703 of Title VII by discharging them from employment and imposing discriminatory working conditions on them.[3] In text we address each of appellants' principal contentions.

*Discharges.*

◼ Each appellant relies on a disparate treatment theory to establish a case of discriminatory discharge. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). A case proceeding on this theory has three phases: first, plaintiff's establishment of a prima facie case; second, defendant's rebuttal of the prima facie case; and third, plaintiff's proof that defendant's rebuttal is a pretext to cover a discriminatory motive. *McCosh v. City of Grand Forks*, 628 F.2d 1058, 1062 (8th Cir. 1980).

◼ To establish a prima facie case of discriminatory discharge in the present circumstances, each appellant must show that (1) he was a member of a protected class, (2) he was capable of performing the job, and (3) he was discharged from the job. *See Osborne v. Cleland*, 620 F.2d 195, 198 (8th Cir. 1980).

There was conflicting testimony concerning the events which led to appellants' terminations. After viewing the witnesses and hearing their testimony, the district court made the following findings:

1. Johnson was discharged in September, 1975 for laughing at the plant supervisor, Rusty Schaffer, while Schaffer was showing Johnson how to perform his job properly.

2. White was discharged in September, 1975 for leaving his job voluntarily and without permission from his supervisor.

3. Johnson was discharged in January, 1976 for swearing at an assistant supervisor in the presence of Rusty Schaffer.

4. White voluntarily resigned from Bunny Bread in January, 1976.

5. Bunny Bread gave no warnings with respect to discharges resulting from insubordination.

◼ Unlike this court, the district court is in a superior position to determine the witnesses' credibility, and to resolve conflicts in the testimony. "We do not decide the case anew, but review the trial court's decision," *Kellen v. ACF Industries*, 629 F.2d 532, 534 (8th Cir. 1980), giving due regard to the opportunity of that court to judge the credibility of the witnesses, *Bowers v. Kraft Foods Corp.*, 606 F.2d 816, 818

---

**3.** Appellants also allege that they were retaliated against for filing a complaint with the EEOC. They claim this retaliation took the form of close monitoring and constant job shifting. The district court permissibly found that all employees at Bunny Bread were watched closely by their supervisors, and that constant job shifting was a trait common to employees classified as helpers. Since the actions appellants complain of are not unique to them but rather characteristic of Bunny Bread's operation, we cannot say that they were taken as retaliation for appellants having filed complaints with the EEOC or that the district court erred in concluding there was no unlawful harassment.

In addition, appellants complain on appeal about the introduction at trial of certain testimony. Although it appears that appellants invited the use of the testimony which they now contest and thus may not now be heard to complain, we nonetheless, after examining that testimony, find that its admission did not adversely affect any substantial rights of appellants. Thus, we find no reversible error. Fed. R.Evid. 103.

(8th Cir. 1979). With this in mind, a careful review of the transcript of the testimony and the entire record does not convince us that the district court's findings are clearly erroneous. Accordingly, we examine appellants' terminations in light of those findings.

■ Assuming Johnson established a prima facie case concerning his September, 1975 discharge, we must determine whether Bunny Bread has rebutted it by articulating a legitimate business reason for the discharge. *Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978). "[A]rticulat[ing] some legitimate, nondiscriminatory [business] reason," *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), only requires an employer to present admissible evidence sufficient to raise a genuine factual issue as to whether plaintiff was discriminated against. *Texas Department of Community Affairs v. Burdine*, —— U.S. ——, ——, 101 S.Ct. 1089, 1097, 67 L.Ed.2d 207 (1981). Clearly, an employer bears no burden of persuading by a preponderance of the evidence that it was actually motivated by its proffered reason. *Id.; contra, Vaughn v. Westinghouse Electric Corp.*, 620 F.2d 655, 657 (8th Cir. 1980), *vacated*, —— U.S. ——, 101 S.Ct. 1504, 67 L.Ed.2d 808 (1981).

Bunny Bread presented detailed testimony of several witnesses, all to the effect that Johnson was fired for insubordination. As evidenced by the trial transcript, this testimony "fram[ed] the factual issue with sufficient clarity so that plaintiff [had] a full and fair opportunity to demonstrate pretext." —— U.S. at ——, 101 S.Ct. at 1095. Since insubordination is a legitimate ground on which to base a discharge, *Guy v. Swift & Co.*, 612 F.2d 383, 386 (8th Cir. 1980), it follows that Bunny Bread rebutted Johnson's prima facie case.

Johnson attempts to show that his alleged insubordination is a pretext for Bunny Bread's discriminatory motive. The burden is his to prove this by a preponderance of the evidence. —— U.S. ——, 101 S.Ct. at 1094. Johnson relies on two methods of proof to establish pretext.

■ First, Johnson alleges that, unlike himself, insubordinate white employees received warnings before they were discharged. Such a showing would be indicative of pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 804, 93 S.Ct. at 1825; *Osborne v. Cleland*, 620 F.2d at 198. Title VII, although permitting discharge without a warning, will not tolerate discriminatory application of a warning policy. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 283–84, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976). Here, the district court found that Bunny Bread never gave warnings prior to discharging employees for insubordination. This finding forecloses Johnson's attempt to prove pretext by showing Bunny Bread issued warnings in a discriminatory manner.

■ Next, Johnson relies on generalized statistics and urges that from these statistics an inference of a particular discriminatory intent should be drawn. These statistics show that (1) between 1973 and 1976 Bunny Bread hired, excluding appellants, three black employees of which two were involuntarily discharged and one voluntarily quit and (2) Bunny Bread's work force was 2.7% black while the surrounding city was 4.1% black and the surrounding county was 3.0% black.

Johnson's claim rests on a particular act, his discharge, which he alleges was the result of a disparate treatment. In such a case, "proof of a discriminatory motive is critical," *International Brotherhood of Teamsters v. United States*, 431 U.S. at 335 n.15, 97 S.Ct. 1854, and, as indicated, plaintiff has the burden to establish his claim by a preponderance of the evidence, *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 703 (8th Cir. 1980). Proving a pretext to be sure is nothing more than exposing a discriminatory motive.

Generalized statistics used to prove a particular intent must be scrutinized closely. Bunny Bread stated that the black employees' involuntary discharges resulted from an inability to perform the work. Appel-

lants, although well aware of the base job requirements, presented absolutely no evidence to the contrary. From this we can only assume that the discharges were probably legitimate, which in turn leaves the statistics with little, if any, probative value. We also note that during the relevant time period appellee discharged three white employees, two because they were unable to perform the work.

The demographic statistics, of great value in establishing a pattern or practice of discrimination, in present circumstances are of little value. "Without additional evidence . . . the connection between [these statistics] and [Johnson's] discharge is too attenuated to compel a finding of [discriminatory] motive." *Person v. J. S. Alberici Construction Co.*, 640 F.2d 916 at 919 (8th Cir. 1981) (citation omitted).

Although recognizing that these generalized statistics might have some probative value, we nonetheless conclude that in the circumstances and in light of the evidence presented by appellee the statistics presented are insufficient to carry appellant's burden. "[S]uch general determinations, while helpful, may not be in and of themselves controlling as to an individualized [discharge] decision, particularly in the presence of an otherwise justifiable reason for the [discharge]." *McDonnell Douglas Corp. v. Green*, 411 U.S. at 805 n.19, 93 S.Ct. at 1825 n.19. *Compare Marquez v. Omaha District Sales, Ford Division*, 440 F.2d 1157, 1162 (8th Cir. 1971) (use of statistics absent a justifiable reason). We conclude that Johnson has failed to prove pretext by a preponderance of the evidence.

White was discharged in September 1975 for leaving his job without the permission of his supervisor.[4] This constituted a violation of company rules, and for that reason White was discharged. Assuming White established a prima facie case of discriminatory discharge, it is apparent that it was rebutted by Bunny Bread. Violation of company rules is a legitimate ground on which to base a discharge. White has failed to show that the reason given for his discharge was a pretext.[5]

Bunny Bread alleges that Johnson's discharge in January 1976 resulted from his insubordination. The district court's findings support this allegation. This insubordination rebutted any prima facie case that might have been established. Johnson asserts, however, that his alleged insubordination is merely a pretext for Bunny Bread's discriminatory motive.

Johnson attempts to prove a pretext by showing that white employees who engaged in similar conduct were not discharged. In support of this assertion, Johnson presented testimony of a white employee who, despite having sworn at John Buck (an assistant supervisor), was not discharged. Accepting this as true, it does not follow that Johnson was treated differently than white employees.

For Johnson to prove a pretext he must show a similarity between his conduct and that of white employees not discharged. *Kendrick v. Commission of Zoological Subdistrict*, 565 F.2d 524, 527 (8th Cir. 1977). He has failed to do so. Rusty Schaffer, the plant supervisor, heard Johnson swearing at an assistant supervisor. In the example relied on by Johnson, Rusty Schaffer did not hear the white employee swear at an assistant supervisor. The testimony showed this to be the case. Schaffer testified that the only employee, other than Johnson, he had ever heard swear at a

---

4. White contends that he did not leave voluntarily and without permission but was told to do so by his supervisor. The district court found that White was told that, "if you can't do the job why don't you go home." If we accept White's contention that he was commanded to leave, we must also accept the condition that accompanied the command, that condition being White's inability to perform. If White was unable to perform the job, then Bunny Bread was certainly justified in discharging him.

If White impermissibly left his job because of harassment by his employer, then we would have a different case. As indicated in the text, the district court found to the contrary and we cannot say this was clearly erroneous.

5. White relies on those general statistics relied on by Johnson to show a pretext. For the reasons discussed *supra* we conclude that no pretext has been shown.

supervisor was white. Schaffer discharged that employee. Johnson was discharged because Rusty Schaffer heard him swear at a supervisor, and not because he was black. The evidence showed that blacks and whites engaged in similar conduct were treated identically.

White resigned from Bunny Bread in January, 1976. He claims, however, that this resignation was responsive to intolerable working conditions, and for that reason should be characterized as a constructive discharge. A constructive discharge must be shown in order for White to establish his prima facie case.

■ "A constructive discharge exists when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job." *Slotkin v. Human Development Corp.*, 454 F.Supp. 250, 255 (E.D.Mo.1978). *See Thompson v. McDonnell Douglas Corp.*, 552 F.2d 220, 223 (8th Cir. 1977). White alleges that close monitoring and harsh treatment by his supervisors made his working conditions intolerable.[6]

■ To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit. Such is not the case here. The supervisors at Bunny Bread were very demanding of the employees. The district court found that all employees were closely monitored and often dealt with in a harsh manner. This finding is supported by the evidence and not clearly erroneous. The fact that all employees were treated identically rebuts any inference that Bunny Bread's handling of White was done with the intention of forcing him to resign. Certainly Bunny Bread did not wish to force all of its employees to resign. An employee may not be unreasonably sensitive to his working environment. A constructive discharge arises only when a reasonable person would find conditions intolerable. We cannot find that White has shown a constructive discharge.

*Working Conditions.*

■ During their employment with Bunny Bread, appellants were required to hand-scrub the brew tank. They assert that this job was given to them only because they were black, and for that reason constituted a discriminatory working condition violative of Title VII. Johnson testified that during his employment with Bunny Bread he had never witnessed a white employee hand-scrubbing the brew tank. A white employee testified that, while he had in the past witnessed white employees hand-scrubbing the brew tank, this procedure was ended some time before appellants were hired, and it was only after appellants were hired that he saw it used again, and then only by black employees.

Bunny Bread explained that hand-scrubbing the brew tank was always performed by those employees with the least seniority, which usually resulted in the task being performed by helpers. Prior to appellants' hiring, white employees had hand-scrubbed the brew tank. Hand-scrubbing was discontinued approximately one year prior to the time appellants were hired. Bunny Bread discontinued hand-scrubbing because it had purchased a pressurized sprayer which it felt cleaned the brew tank sufficiently.

A short time after switching to the pressurized sprayer, Bunny Bread's plant was inspected by the American Baking Institute. Following inspection the American Baking Institute recommended that Bunny Bread start hand-scrubbing again because cleaning with the pressurized sprayer alone presented potential health problems that were not present when hand-scrubbing was used. The hand-scrubbing procedure was reinstituted before appellants were hired. It was used throughout appellants' employment and is continuing to be used by both black and white employees.

Faced with conflicting testimony, the district court accepted Bunny Bread's explana-

---

6. See note 2 *supra*. White also alleges that his working conditions were made intolerable by constant racial slurs. Any racial slurs used at Bunny Bread did not constitute a Title VII vio-

lation and for that reason cannot be characterized as intolerable. See *Working Conditions* discussion *infra*.

tion, and we cannot say it was clearly erroneous in doing so. Any inference raised that appellants were required to hand-scrub the brew tank because they were black was rebutted by Bunny Bread's explanation. *See Furnco Construction Co. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). When the hand-scrubbing procedure was used it was applied to blacks and whites equally, the determinative factor being employee seniority. Appellants cleaned the brew tank by hand because (1) the procedure was used while they were employed,[7] (2) they were classified as helpers, and (3) they possessed the least seniority. Appellants "[were not] singled out to do the job because [they were] black." *Reed v. Arlington Hotel Co.*, 476 F.2d 721, 722 (8th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973). Appellants have failed to demonstrate the evil against which Title VII is directed, that they were treated less favorably because of their race. *International Brotherhood of Teamsters v. United States*, 431 U.S. at 335 n.15, 97 S.Ct. 1854.

■ Appellants also claim that they were subjected to racial slurs which constituted a discriminatory working condition violative of Title VII. Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII. This is not to say, however, that all racial slurs rise to the level of Title VII violation. In this area, we deal with degrees.

■ The extent to which racial slurs were used was a subject of much conflicting testimony. Appellants testified that their supervisors and fellow employees often referred to them as "niggers." Schaffer testified that he had never referred to appellants as "niggers." He also testified that he had never heard other supervisors or employees refer to appellants as "niggers," and that if he had those individuals would have been reprimanded. There was testimony by other employees corroborating the testimony of both Schaffer and appellants.

After a painstaking review of the transcript, we conclude that as a matter of law the racial slurs, if any, used at Bunny Bread did not violate Title VII. We find no steady barrage of opprobrious racial comment. The use, if any, of racial terms was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward appellants. "[M]ore than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions." *EEOC v. Murphy Motor Freight Lines, Inc.*, 488 F.Supp. 381, 384 (D.Minn.1980) (citations omitted). *See Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir. 1977). Such racial slurs as were present at Bunny Bread were largely the result of individual attitudes and relationships which, while certainly not to be condoned, simply do not amount to violations of Title VII.

We conclude that the judgment of the district court should be, and it is, in all respects affirmed.

---

7. If the reason it was used during appellants' employment was because it had been implemented specifically for them, we would have a different case. The evidence is, however, to the contrary.